UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STEEL, PAPER & FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL & SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO ("USW"), AND ITS LOCAL 8751, <br><br> Plaintiffs, <br><br> v. <br><br> TRANSDEV SERVICES, INC., <br><br> Defendants. | Civil Action No. 1:16-cv-11481 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF UNIONS' MOTION FOR PRELIMINARY INJUNCTION**

**I. Introduction**

By its motion for a preliminary injunction, the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO and its Local 8751 (collectively "Union" or "USW") seek to preserve a meaningful opportunity to arbitrate their dispute with Transdev Services, Inc. ("Transdev" or "Company") over the contract rights of the USW and its local union with respect to the Company's unilateral changes to employee health insurance plans and other benefits.

The USW and Transdev are parties to a collective bargaining agreement ("CBA") that sets forth the Company's required contribution to premiums under the health insurance plans the Company provides for employees on workers' compensation and certain other approved leaves. Specifically, the CBA provides that, "the company will pay 100% of the premium for employees on Workers Compensation" and that, for employees on other approved leaves, the Company will

pay 100% of the premium for the first two months, and 80% thereafter for the remainder of the calendar year.  The CBA further provides for other benefits that are fully paid by the Company to which employees on workers' compensation or other approved leaves are entitled.

The Company has now violated this agreement by sending letters purporting to be "benefit invoices" to employees on workers' compensation and other approved leaves, billing them for premium payments related to their health insurance and other non-specified benefit plans.  By these letters, the Company has informed affected employees that failure to submit payment by July 1, 2016, will result in cancellation of their benefits on August 1, 2016.  The letters do not provide any explanation of what is being billed or even to which benefits plans the billings apply.  The amounts demanded are in the hundreds and thousands of dollars, ranging up to $6,491.66 – far more than employees, many of whom are out of work on disability leaves, can afford to pay.  Consequently, employees who are unable to make the payments demanded by the Company face termination of their medical insurance, which will likely result in their foregoing their prescribed medications and necessary medical treatments altogether.

The Union's grievance protesting the Company's unilateral changes to employee benefits plans is currently proceeding toward arbitration.  The Company has not agreed to rescind its demands for payment nor has it agreed to continue employees' coverage while the arbitration is pending.  As a result, without this Court's intervention, serious irreparable harm will befall members of the bargaining unit during the period before an arbitrator renders a decision.  We now seek that arbitration be expeditiously ordered, along with other equitable relief including a status quo injunction to preserve the arbitrator's authority to grant meaningful relief to the USW and its members. If the Company terminates medical insurance and other benefits for employees

on approved leaves before an arbitration decision can be rendered, these employees are likely to sustain irreparable harm well beyond the arbitrator's power to reverse.

## II. Facts

The USW is the collective bargaining representative for a bargaining unit comprised of employees of the Company who furnish transport for school children for the City of Boston, Massachusetts. (Verified Complaint ¶ 4). For many years, the USW and the Company have been parties to a series of collective bargaining agreements covering employees at the facility. (Verified Complaint ¶ 2). The most recent collective bargaining agreement commenced on July 1, 2014, and is scheduled to remain in effect until at least June 20, 2018 ("CBA"). (Complaint Exhibit A – CBA, Article 29).

The CBA between the USW and the Company contains a grievance and arbitration procedure which defines a grievance as any "complaint or request of an employee covered by this Agreement which involves the interpretation or application of, or compliance with the provisions of this Agreement." (Verified Complaint ¶ 5; Complaint Ex. A – CBA, Article 13, Section 1). The CBA further contains language on medical insurance which provides, in pertinent part:

> The Company shall provide health insurance plans provided by Harvard Pilgrim. The Company will pay 80% of the premium and the employee will pay 20% of the premium. When a driver is on an approved sick leave as defined in the contract, the Company will pay 100% of the health insurance costs for a period not to exceed two monthly premium payments. Thereafter, the Company share shall revert to 80% for the remainder of the calendar year commencing with the approved leave. The Company will pay 100% of the premium for employees on Workers Compensation.

(Verified Complaint ¶ 6; Complaint Ex. A – CBA, Appendix B).

On May 27, 2016, the Company mailed letters to bargaining unit members on approved leaves, including workers' compensation leaves, demanding that they make certain premium payments to the Company by July 1, 2016, and informing them that "failure to submit payment will result in cancellation of your benefits." (Verified Complaint ¶ 7; Complaint Ex. B). According to the letters, if payment is not received by July 1, 2016, employees' benefits will be terminated. (Verified Complaint ¶ 7; Complaint Ex. B). The letters do not identify what employee benefits are included in the demand letter, how the amounts demanded relate to employee obligations under the benefits plans, or how the dollar amounts were calculated. (Verified Complaint ¶ 7 & 12; Complaint Ex. B & D).

Prior to May 27, 2016, the Company had not, in more than 30 years, demanded premium payments from employees on workers' compensation leaves, or any other types of leaves. (Verified Complaint ¶ 12; Complaint Ex. D).

Most of the employees who received these letters will be unable to pay the amounts demanded. (Verified Complaint ¶ 12; Complaint Ex. E, F). If the Company terminates the health insurance coverage of employees on leave who are unable to make the demanded payments, it is very likely that these employees will have to go without needed medical care and prescription medication. (Verified Complaint ¶ 12; Complaint Ex. E, F). If the Company terminates other employee benefits, which it has failed to identify – but threatens to discontinue, it is very likely that employees will suffer additional adverse consequences. (Verified Complaint ¶ 12; Complaint Ex. E-K).

Transdev employee Gethro Agenor is currently undergoing chemotherapy treatment for liver cancer. (Verified Complaint ¶ 12; Complaint Ex. E). His cancer treatment also includes

4

other prescription medications, including pain killers and blood pressure medications. (Verified Complaint ¶ 12; Complaint Ex. E). Survival rates for patients with liver cancer are substantially lower without treatment than with appropriate medical treatment.[1] Mr. Agenor's sole sources of income are his long term disability benefits and Social Security benefits as well as his wife's $1,200.00 monthly earnings from employment. (Verified Complaint ¶ 12; Complaint Ex. E). If Mr. Agenor's benefits are discontinued until the case is decided by an arbitrator, it is extremely likely that his health will be seriously and irreparably damaged. (Verified Complaint ¶ 12; Complaint Ex. E). Mr. Agenor will not be able to pay the $1,094.04 demanded by the Company and if he is forced to pay to continue his chemotherapy and other medical treatment, he will face losing his home and being forced to apply for public assistance benefits. (Verified Complaint ¶ 12; Complaint Ex. E).

Transdev employee Jean Eric Charles, who has been unable to work since suffering work-related leg and back injuries, is currently undergoing treatment for those injuries in addition to treatment for diabetes, an enlarged prostate and high blood pressure. (Verified Complaint ¶ 12; Complaint Ex. F). Mr. Charles also receives follow-up care for gastric cancer, which requires prescription medications and insulin. (Verified Complaint ¶ 12; Complaint Ex. F). Mr. Charles' wife, Rose Marie Charles also requires continuing treatment for her diabetes, high cholesterol, allergies, and preventative treatment for glaucoma. (Verified Complaint ¶ 12; Complaint Ex. F). Mr. Charles lives on a fixed income of approximately $1,200.00 from Social Security benefits in addition to his wife's weekly employment earnings of approximately $300-$400. (Verified Complaint ¶ 12; Complaint Ex. F). Mr. Charles will not be able to pay the $4,284.00 demanded by the Company and if Mr. Charles' benefits are discontinued until the case

---

[1] http://www.cancerresearchuk.org/about-cancer/type/liver-cancer/treatment/statistics-and-outlook-for-liver-cancer

is decided by an arbitrator, it is extremely likely that his and his wife's health will be seriously and irreparably damaged. If Mr. Charles is forced to pay for his family insurance, he will face losing his home, means of transportation, and will be forced to apply for public assistance benefits. (Verified Complaint ¶ 12; Complaint Ex. F).

Transdev employee Thelma Grady is currently receiving medical treatment for a right shoulder rupture, knee replacement surgery, high blood pressure, asthma, bladder issues and fibromyalgia. (Verified Complaint ¶ 12; Complaint Ex. G). She is currently prescribed seven prescription medications. (Verified Complaint ¶ 12; Complaint Ex. G). Ms. Grady, who is living on a fixed income of $1,005.00 per month from Social Security disability benefits (less $110 deducted for Medicare), will not be able to pay the $4,506.69 the Company has stated she must pay by July 1, 2016, in order to avoid cancellation of her benefits. (Verified Complaint ¶ 12; Complaint Ex. G). If Ms. Grady is forced to live without benefits during the pendency of the arbitration her health could be irreparably damaged because follow up treatment for her surgeries may be delayed or cancelled and her medication and other treatment will not be covered by Medicare and are prohibitively expensive. (Verified Complaint ¶ 12; Complaint Ex. G). Ms. Grady's granddaughter, who is also covered under Ms. Grady's health insurance will also lose coverage and may have to forgo necessary medical treatment. (Verified Complaint ¶ 12; Complaint Ex. G).

Transdev employee Robert Hemphill, who has not worked since 2002 due to a work related back injury, suffers from diabetes, high blood pressure, high cholesterol and has a pacemaker. (Verified Complaint ¶ 12; Complaint Ex. H). Mr. Hemphill requires continued medical treatment for these health conditions as well as for his back injury and is prescribed six prescriptions medications to treat these conditions. (Verified Complaint ¶ 12; Complaint Ex. H).

Mr. Hemphill is living on a fixed income of $1,199.00 per month from Social Security benefits and will not be able to pay the $4,417.41 demanded by the Company. (Verified Complaint ¶ 12; Complaint Ex. H).  If Mr. Hemphill's health insurance is terminated, he and his wife, Claire Hemphill, who is also covered under the plan, will likely have to forgo necessary treatment for their medical conditions. (Verified Complaint ¶ 12; Complaint Ex. H).

Transdev employee Jean Joseph is currently treating for neck and back pain caused by a work-related injury in 2003. (Verified Complaint ¶ 12; Complaint Ex. I).  Mr. Joseph's wife, Marie Bosquet, who is currently receiving medical treatment for blood pressure and diabetes, and their six children are also covered by the Company's health, dental, and vision insurance. (Verified Complaint ¶ 12; Complaint Ex. I).  Mr. Joseph's nine-year old daughter's medical condition requires her to be treated at Children's Hospital every three months. (Verified Complaint ¶ 12; Complaint Ex. I).  Mr. Joseph is living on a fixed income of $1,013 per month from Social Security benefits in addition to his wife's approximately $2,500 (gross) in monthly employment earnings. (Verified Complaint ¶ 12; Complaint Ex. I).  Mr. Joseph will not be able to pay the $6,249.31 demanded by the Company and faces the loss of his home and means of transportation if he is forced to pay for medical expenses out-of-pocket. (Verified Complaint ¶ 12; Complaint Ex. I).  If Mr. Joseph's benefits are discontinued until the case is decided by an arbitrator, it is extremely likely that his and his family's health will be seriously and irreparably damaged.

Transdev employee Pauline Miller is currently receiving treatment for spinal stenosis, sciatica, glaucoma, high blood pressure, lupus, cataracts, and fibromyalgia. (Verified Complaint ¶ 12; Complaint Ex. J).  Ms. Miller's only source of income is monthly Social Security benefits of $1,346.  Ms. Miller will not be able to pay the $2,537.35 demanded by the Company and faces

the loss of her apartment if she is forced to pay for medical expenses out-of-pocket. (Verified Complaint ¶ 12; Complaint Ex. J). If Ms. Miller's benefits are discontinued until the case is decided by an arbitrator, it is extremely likely that her health will be seriously and irreparably damaged.

Transdev employee Manuel Pimental is currently receiving treatment for a work-related back injury in addition to hypothyroidism, allergies and stomach issues that require continuing treatment and prescription medication. (Verified Complaint ¶ 12; Complaint Ex. K). Mr. Pimental has four children also covered by the Company's health insurance plan, including his son, who is receiving medical treatment for allergies and asthma. (Verified Complaint ¶ 12; Complaint Ex. K). Mr. Pimental is living on a fixed income of $1,074.40 per month from Social Security benefits. (Verified Complaint ¶ 12; Complaint Ex. K). Mr. Pimental will not be able to pay the $6,126.19 demanded by the Company and faces the loss of his home and means of transportation and will face having to apply for public assistance if he is forced to pay for medical expenses out-of-pocket. (Verified Complaint ¶ 12; Complaint Ex. K). If Mr. Pimental's benefits are discontinued until the case is decided by an arbitrator, it is extremely likely that his and his family's health will be seriously and irreparably damaged.

On June 22, 2016, the USW filed a grievance challenging the Company's actions to make unilateral changes to employees' premium contributions under the collective bargaining agreement. (Verified Complaint ¶ 8; Complaint Ex. C).

Under the terms of the CBA, the Union has the right to appeal the grievance to final and binding arbitration if the Company does not rescind its demands for payment from employees. (Verified Complaint ¶ 5; Complaint Ex. F). However, while the grievance process moves forward, the Company's demand for payment stands. (Verified Complaint ¶ 12; Complaint Ex.

8

E).    As a result, employees will be forced to make payments they cannot afford or to forego necessary medical care. (Verified Complaint ¶ 7; Complaint Ex. B).

### III. Argument

It is well established in the First Circuit that the federal courts are empowered, pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to issue injunctions at the request of unions to preserve the status quo pending arbitration of a contract dispute between a union and an employer. *Congreso De Uniones Industriales De Puerto Rico v. V.C.S. Nat. Packing Co.*, 953 F.2d 1, 2-3 (1st Cir. 1991) ("a narrow exception to the prohibition against injunctions does exist in cases where a party seeks injunctive relief in aid of arbitration") citing, *Textile Workers Union v. Lincoln Mills of Alabama,* 353 U.S. 448, 457-58, 77 S.Ct. 912, 918-19, 1 L.Ed.2d 972 (1957); *see also Independent Oil & Chem. Workers, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988).

Although the Norris-LaGuardia Act ("Act"), 29 U.S.C. § 101, *et seq*., severely limits a federal court's ability to issue injunctions related to labor disputes, in *Boys Markets, Inc v. Retail Clerk's Union, Local 770,* the Supreme Court reconciled the broad anti-injunction provisions of Section 4 of the Act, with the strong congressional preference for arbitration, thereby upholding one of the fundamental principles of labor law – that labor disputes be settled peacefully through voluntary arbitration. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957).[2]  In *Boys Markets,* the Court reasoned that the inability of an employer to obtain

---

[2] Since the United Steelworkers Trilogy, (*American Mfg..,* 363 U.S. 574 (1960); *Warrior and Gulf,* 363 U.S. 574 (1960); *Enterprise Wheel,* 363 U.S. 593 (1960)), the United States has maintained a policy of favoring peaceful resolution of labor disputes through voluntary arbitration. *Aluminum Workers v. Consol. Aluminum Corp*., 696 F.2d 437, 441 (6th Cir. 1982).

judicial enforcement of a no-strike clause in a collective bargaining agreement could do more to undermine the arbitral process than a strictly enforced anti-injunction policy would do to promote it. 718 F.2d 818.

Courts have expanded the traditional, narrow *Boys Markets* exception triggered by a strike or a lockout to embrace employer actions which undermine the arbitral process to the extent that "a decision of the arbitrator in the union's favor would be but an empty victory." *International Brotherhood v. Almac's, Inc.,* 894 F.2d 464,465–66 (1st Cir.1990). Thus, injunctive relief is available in aid of arbitration where the underlying dispute is subject to mandatory arbitration under the labor contract and where it is necessary to prevent arbitration from being rendered meaningless. *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276 (7th Cir.1981). In these situations, a so-called "reverse *Boys Markets*" injunction serves the critical function of maintaining the status quo pending arbitration where an employer engages in "behavior which has the effect of evading a duty to arbitrate or which would otherwise undermine the integrity of the arbitral process." *Aluminum Workers Int'l v. Consolidated Aluminum Corp.*, 696 F.2d 437, 441-42 (6th Cir.1982); See also, *Panoramic Corp.*, 668 F.2d 276 (7th Cir.1981); *United Steelworkers of Am. v. Ft. Pitt Steel Casting*, 598 F.2d 1273 (3d Cir. 1979); *Lever Bros. Co. v. International Chemical Workers Union, Local 217,* 554 F.2d 115 (4th Cir.1976); *Hoh v. Pepsico,* 491 F.2d 556 (2d Cir.1974). Such a situation commonly presents itself in a case, like this one, where an employer seeks to make or has already made a significant change to employees' health benefits in violation of a collective bargaining agreement. *See United Steelworkers of Am. v. Ft. Pitt Steel Casting*, 598 F.2d 1273, 1278-1279 (3d Cir. 1979); *Wheelan v. Colgan*, 602 F.2d 1060, 1062 (2nd Cir. 1979).

Under First Circuit law, in order for an injunction to restore or maintain the status quo pending arbitration to issue, (1) the dispute must be arbitrable; (2) an injunction must be necessary to preserve the arbitral process; and (3) irreparable harm and imbalanced hardships would result without the injunction. In the context of a reverse *Boys Markets* injunction, "the irreparable harm inquiry has come to focus on whether, without the injunction, the arbitration would become meaningless." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local Union No. 251 v. Almac's, Inc.*, 894 F.2d 464, 465 (1st Cir. 1990). *See also, Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 930 (1st Cir. 1988).

All of these injunction criteria are present in this case.

**1.** **The Dispute Is Arbitrable**

As a threshold to issuance of a reverse *Boys Market* injunction, a union must establish that the underlying grievance is arbitrable. In determining arbitrability, "[t]he court's role is limited to determining whether the parties agreed to submit the underlying dispute to arbitration." *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 568 (1960)). The court is "not to rule on the potential merits of the underlying claims" *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 649 (U.S. 1986); *Strathmore Paper Co. v. United Paperworkers Int'l Union, AFL-CIO*, 900 F.2d 423, 425 (1st Cir. 1990).

Where, as here, the collective bargaining agreement contains a broad arbitration clause, "all questions […] will be properly consigned to the arbitrator." *New England Cleaning Servs., Inc. v. Servs. Employees Int'l Union, Local 254, AFL-CIO*, 199 F.3d 537, 541 (1st Cir. 1999); See also, *Int'l Bhd. of Elec. Workers, Local 1228 v. Freedom WLNE–TV, Inc.*, 760 F.2d 8, 10

11

(1st Cir.1985) (citing *Rochdale Village, Inc. v. Public Service Emp. Union, Local No. 80,* 605 F.2d 1290, 1295–96 (2d Cir.1979)).

Moreover, where a question exists as to whether an arbitration clause is susceptible to an interpretation that covers the asserted dispute, "doubts should be resolved in favor of coverage." *Local 285, Serv. Employees Int'l Union, AFL-CIO v. Nonotuck Res. Associates, Inc.*, 64 F.3d 735, 738 (1st Cir. 1995), citing *AT & T Technologies, Inc. v. Communications Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960)).

The contractual grievance and arbitration clause in the parties' CBA is expansive. Article 13, Section 1 of the CBA defines a grievance as any "complaint or request of an employee covered by this Agreement which involves the interpretation or application of, or compliance with the provisions of this Agreement." This dispute turns on an interpretation of the CBA provisions governing benefits for employees on workers' compensation and other approved leaves. These terms are set forth in Appendix B of the collective bargaining agreement and the June 17, 2013 Memorandum of Agreement concerning the calculation of benefits under the Long Term Disability Plan incorporated into the collective bargaining agreement. The Company explicitly stated in its letters of May 27, 2016, that it was relying on the contractual language contained in Appendix B of the CBA to make the demands for premium payments from employees. The Union's grievance challenging the Company's demand for such payments under Appendix B and other relevant sections of the CBA, therefore, unquestionably implicates a "complaint or request of an employee" involving "the interpretation or application of, or

compliance with the provisions of this Agreement." Accordingly, the Court should find that this dispute is arbitrable and that the first requirement for injunctive relief is satisfied.

**2.    An Injunction Is Necessary To Preserve the Arbitral Process**

An employer's actions frustrate the arbitral process chosen by the parties when, if unrestrained by a status quo injunction, they threaten to render an arbitrator's award "no more than 'a hollow formality.'" *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 931 (1st Cir. 1988), *quoting, Lever Bros. v. Int'l Chemical Workers, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976). *See also, Panoramic,* 668 F.2d at 283 (an injunction may issue if, without one, arbitration would be reduced to "a meaningless ritual"). An injunction in aid of arbitration is appropriate, therefore, when the actual or threatened harm would amount to a frustration or vitiation of arbitration. *Int'l Ladies' Garment Workers' Union v. Bali Co.,* 649 F. Supp. 1083, 1084 (D.P.R. 1986), cause dismissed, 815 F.2d 691 (1st Cir. 1987).

Conduct by an employer that results in employees being unable to access affordable medical care threatens to render an arbitral award a hollow formality because of the potential that employees (and their dependents) could suffer irreparable damage to their health. *Ft. Pitt Steel Casting*, 598 F.2d at 1282-1283; *Exide Corp.*, 688 F. Supp. at 186.  In the instant case, as discussed in detail below, the Union has established that employees face dire health consequences resulting from the Company's termination of their health insurance benefits. These injuries simply cannot be rectified by an arbitrator's after-the-fact monetary award. The likelihood of severe irreparable harm, e.g., preventable deaths, increases every day. The employees in this case are particularly vulnerable to suffering irreversible health problems caused by the termination of their medical insurance since many of them are out of work on disability or workers' compensation leave.

Without the issuance of an injunction, arbitration would indeed be merely "a hollow formality" because "when rendered (the award) could not return the parties substantially to the status quo ante." *Lever Bros. v. Int'l Chemical Workers, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976).

**3.     Irreparable Harm Will Result Without An Injunction**

A party seeking injunctive relief must establish that it will suffer irreparable harm if injunctive relief is denied.  As the First Circuit explained in *International Brotherhood v. Almac's, Inc.*, 894 F.2d 464,465-66 (1st Cir. 1990), "[i]n the labor environment, the irreparable harm inquiry has come to focus on whether, without the injunction, the arbitration would become meaningless." Thus, irreparable injury, "does not mean simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather 'injury so irreparable that a decision of the arbitrator in the union's favor would be but an empty victory.'" *Id.,* at 465, n.2.  See also, *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad,* 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960) ("A showing of irreparable injury means not simply any injury resulting from a breach of the collective bargaining agreement, but rather 'injury so irreparable that a decision of the [arbitrator] in the union's favor would be but an empty victory.'")

Courts in this circuit and others have recognized that an employers' failure to pay health benefits may give rise to irreparable harm. In *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987), the First Circuit upheld the District Court's preliminary injunction requiring the employer to pay retiree health insurance premiums during the pendency of a suit between the Union and the employer in order to preserve the status quo, reasoning that

irreparable harm was demonstrated where retirees were faced with potential financial ruin in order to continue their medical insurance:

> [W]orkers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities (in order to keep up in insurance payments). In short, taken together, these facts would show harm that, in this sort of case, is 'irreparable.'

*Id.* at 8.

Likewise, other circuit courts have held in the labor injunction context that "the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury.'" *Ft. Pitt.*, 598 F.2d at 1280, *quoting Celotex Corp. v. Oil Workers*, 516 F.2d 242, 247 (3rd Cir. 1975); *see also, Wheelan v. Colgan*, 602 F.2d 1060, 1062 (2nd Cir. 1979) ("[T]he threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury."). As explained in *Exide Corporation*, 688 F. Supp. at 187, where the court held that the employer's reduction in health insurance benefits that drastically increased workers' share of the costs of treatment gave rise to irreparable harm: "A substantial risk exists that workers will forego necessary medical treatment or diagnosis because of their inability to pay their share of the costs." 688 F. Supp. at 187. Likewise, in *Mamula v. Satralloy, Inc.,* 578 F. Supp. 563, 577 (S.D. Ohio 1983), the court granted the Union's preliminary injunction based on a showing of irreparable harm:

> It is a utopian notion that all working men and women or retirees can well afford, without insurance, the cost of essential medical services today or that, if they cannot afford them, those services will always be provided to them. The harsh reality […] is that persons on limited incomes who are not covered by some form of medical insurance often forego needed medical attention because of its prohibitive cost. Being denied today's passport to the doctor's office and hospital—the health insurance card—which the employer promised under the collective bargaining agreement, results in harm that is not readily measurable but is clearly present. The ultimate effects of delay in obtaining medical attention or of not receiving any medical attention, or of purchasing inadequate coverage

are all incapable of being easily measured. The harm, difficult to assess in monetary terms but real to the plaintiffs, cannot be adequately compensated by some judgment for damages awarded many months or even years after the termination of the plan occurred.

578 F. Supp. at 577.

As the affidavits attached to the Complaint illustrate, irreparable harm will result if the injunction is not granted.  Most of the employees affected by the Company's threatened termination of benefits are living on fixed incomes from long term disability or Social Security benefits.  They simply do not have the financial resources to pay the premium amounts demanded by the Company and will likely have to forgo necessary treatment for their medical conditions if their benefits are terminated.  Many of the employees also have dependent spouses or children also relying on the benefits for their medical and other insurance.

The harm that employees will suffer from having to forgo necessary medical treatment and discontinue prescription medications cannot be remedied by a future arbitration award.  In the case of employees who are receiving treatment for life-threatening conditions, such as Gethro Agenor who is currently undergoing chemotherapy for liver cancer, the Company's termination of healthcare benefits could have fatal consequences.  Even in the absence of a life-threatening condition, the risk of untreated diabetes spiraling out of control, of post-operative complications developing, of untreated glaucoma causing blindness, or a catastrophic asthma attack going untreated due to lack of medication, are very likely to be the devastating consequences of the Company's termination of insurance coverage.  With their access to medical care interrupted, employees also face deterioration of currently-managed health conditions and the potential development of life-threatening illnesses, none of which can be reversed by an arbitrator's award.

The balance of harms also weighs in favor of an injunction. *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 930 (1st Cir. 1988). The Company will suffer only monetary loss as a result of the injunction sought by the Union. These financial losses will be comparatively slight, as the costs of maintaining coverage for employees on approved leaves is minimal relative to the cost of providing benefits to the Company's active workforce. The harm to the Union, on the other hand, is much more severe; it is the lack of adequate medical care and resulting risk to its members' health. In this case, as in *Exide Corporation*, "plaintiff and its members are in greater jeopardy than the defendant." 688 F. Supp. at 191.

### IV. Conclusion

The Court should issue a preliminary injunction ordering the Company to continue to pay the premiums associated with employees' benefits plans. The parties' dispute over the Company's announced changes to employees' contractually-mandated benefits is plainly arbitrable, and the Union has a sufficient argument that it will prevail on the merits. The Company has frustrated the arbitral process by announcing unilateral changes to employee health insurance and other benefit plans which threaten to deprive employees entirely of employer-sponsored health insurance coverage, thereby risking irreparable harm – including premature death – that would render an arbitrator's award nothing but a hollow formality. This irreparable harm to the health of employees and their families outweighs the minor costs such an order would impose on the Company. Further, an injunction would preserve bargained-for health benefits and advance the federal policy in favor of the resolution of industrial disputes through arbitration by preserving the ability of the arbitrator to render a meaningful award.

       Respectfully submitted,

       UNITED STEEL, PAPER & FORESTRY, RUBBER,
       MANUFACTURING, ENERGY, ALLIED INDUSTRIAL
       & SERVICE WORKERS INTERNATIONAL UNION,
       AFL-CIO ("USW"), AND ITS LOCAL 8751

       By their attorneys,

       /s/ Alfred Gordon O'Connell
       Alfred Gordon O'Connell, Esq.  BBO# 630456
       James Hykel, Esq.  BBO# 666861
       PYLE ROME EHRENBERG PC
       2 Liberty Square, 10th Floor
       Boston, MA 02109
       (617) 367-7200
       agordon@pylerome.com
       jhykel@pylerome.com

Dated: July 18, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2016, I electronically filed the above document with the Clerk of Court using the CM/ECF system, and a copy will be served along with the Summons and Complaint in accordance the Federal Rules of Civil Procedure.

       /s/ James Hykel
       James Hykel